## THE JUMNA.

### (District Court, S. D. New York. September 8, 1905.)

1. COLLISION—LIABILITY—FAULTS OF NAVIGATION.

Legal liability for damages for a collision does not necessarily arise from acts or omissions which may have caused, or might have prevented, the collision; but a fault of navigation imposing such liability must be one which was clearly bad seamanship at the time, irrespective of its results.

[Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Collision, § 16.]

2 SAME—TOW AND STEAMSHIP BEING MOVED FROM PIER—INEVITABLE ACCIDENT.

While three tugs were engaged in moving a steamship from a pier in East river, a short distance above Brooklyn Bridge, to a point below the bridge, and after they had reached about the middle of the river and had exchanged signals with a tug coming up the river with tows to pass starboard and starboard, the hawser by which the forward tug was pulling the stem of the steamship around to head her downstream broke. and a collision resulted between her and the upward-bound tows, and the latter were also driven against the piers on the Manhattan side and injuries were caused to both vessels and piers. *Held*, under all the facts and circumstances shown, that there was no legal fault on the part of any of the vessels, but that the collisions were the result solely of the breaking of the hawser, which was attributable in a legal sense to inevitable accident.

3. SAME—MANNER OF MAKING UP TOW.

A tug passing up East river, in the vicinity of Brooklyn Bridge, with three tows arranged on two lengths of hawser, the whole extending to a length of 800 or 900 feet, cannot be held liable for a collision between her tows and another vessel, solely on account of the manner in which the tow was made up, since, while such a long tow is more unmanageable than a shorter one, and imposes the duty of extreme care on the tug in such waters, it is neither illegal nor unusual.

In Admiralty. Suits for collision.

Wing, Putman & Burlingham (Charles C. Burlingham, of counsel), for the Gypsum King, the Gypsum Emperor, and the J. B. King & Co. No. 19.

James J. Macklin, for the McCaldin Brothers and the J. S. T. Stranahan.

Butler, Notman & Mynderse (Wilhelmus Mynderse, of counsel), for the W. Freeland Dalzell.

Convers & Kirlin (J. Parker Kirlin, of counsel), for the Jumna.

Henry W. Taft (Joseph H. Choate, Jr., of counsel), for New York, New Haven & Hartford R. Co.

HOLT, District Judge. These suits are brought to recover damages for certain collisions which followed the breaking of a hawser while the steamship Jumna was being towed in the East river, on December 7, 1904. The Jumna that morning was lying in the East river at Arbuckle's Wharf, Brooklyn, about a quarter of a mile above the Brooklyn Bridge. The McCaldin Bros. Co. had contracted with the captain of the Jumna to provide three tugboats to move the Jumna from Arbuckle's Wharf to the Erie Basin, South Brooklyn. The McCaldin Bros. Co. accordingly that morning sent three tugboats to the Jumna—the McCaldin Brothers, the James S. T. Stranahan, and the

W. Freeland Dalzell. The Jumna lay at the end of the pier, headed down the river. There was a projection out into the river from the lower end of the pier, making a jog or pocket, in which the bow of the steamer lay. The Dalzell took a hawser from the starboard chock of the steamer. The Stranahan was made fast to the starboard quarter of the steamer, and the McCaldin Brothers was made fast alongside of the Stranahan. Capt. Howe, the pilot of the McCaldin Brothers, went on the bridge of the Jumna to generally direct the operation of the removal. The Stranahan and the McCaldin Brothers first moved the steamer back a little, so that her stem cleared the projection on the pier, and then the Dalzell headed out into the stream, towards the New York end of the bridge, and towed the Jumna out to about the middle of the river. The tide was strong flood, and, as the river changes its direction a little at the bridge, so that a flood tide above the bridge sets over towards the New York shore, the effect of the tide upon the steamer increased as she approached the middle of the river. After the steamer arrived at about the middle of the river the Dalzell gradually began working across the bow of the Jumna and heading towards Brooklyn, with the intention of pulling the bow of the Jumna around and going down the river, and the McCaldin Brothers cast off from the Stranahan, with the intention of going around the stern of the steamer and making fast on her port quarter. About this time the pilot on the Dalzell noticed a tug and tow coming up the river, under the bridge. The tug was the Gypsum King. She had in tow, on a hawser of about 40 fathoms, the schooner Gypsum Emperor and a barge, the J. B. King & Co. No. 19, side by side, the barge being the starboard boat, and trailing behind them, on another hawser of about 40 fathoms, was the schooner Calabria. When the Gypsum King was about under the center of the Brooklyn Bridge, and about 600 feet from the Dalzell, the Dalzell gave a signal of two whistles, indicating an intention to pass starboard to starboard, and the Gypsum King replied with two whistles, assenting to the proposed maneuver. Thereupon the Dalzell worked steadily over, heading more and more towards the Brooklyn shore, endeavoring to pull the head of the steamer around. But the tide was strong, the tug McCaldin Brothers had not yet got made fast on the port quarter of the Jumna, and not much impression as yet had been made on the course of the steamer, which was still heading down and across towards the New York shore, when suddenly the hawser leading from the Dalzell to the Jumna parted near the stem of the Jumna. Capt. Howe directed the McCaldin Brothers to go back to the starboard side of the steamer forward and push against the steamer, and the Dalzell turned around and went back around the steamer's stern to co-operate. Meanwhile the Stranahan backed, attempting to carry the Jumna back, but the effect of the Stranahan's backing seemed to be principally to turn the steamer's head more directly across the stream, and the tide carried her over somewhat toward the New York shore. As soon as the hawser broke, the Gypsum King starboarded her wheel, and the men on the boats in her tow did the same. The Gypsum King kept on at full speed and safely passed the Jumna, between her and the New York shore, but the barge No. 19 came in collision with the Jumna, on her port bow, causing ser-

ious injuries both to the Jumna and the barge. Immediately after the collision, and after the barge and schooner had worked along in front of the steamer, the Gypsum King started ahead on her hawser, at full speed, in an effort to haul the boats in her tow clear of the New York piers. The effort, however, was unsuccessful, and both the Gypsum Emperor and Barge No. 19 came in collision with Pier No. 38, leased by the New York, New Haven & Hartford Railroad Company, causing serious damage to the pier and to the two vessels. Then the Calabria came on with the tide, and struck the stern of Barge No. 19 with her stem, damaging both the Calabria and Barge No. 19. One of these suits is brought by the J. B. King Transportation Company, the owner of the tug Gypsum King and owner or charterer of the boats in her tow. Another of the suits is brought by the Mercantile Steamship Company, Limited, the owner of the steamship Jumna. Another of the suits is brought by the New York, New Haven & Hartford Railroad Company, to recover for damages to the pier. All these suits have been tried together.

It is easy, after such an accident, upon a minute scrutiny of the facts, to discover certain acts or omissions, without which the collision might not have occurred. But legal liability for damages does not necessarily arise from such acts or omissions. A fault of navigation imposing legal liability for a collision must be one which was clearly, at the time, bad seamanship, irrespective of its results. Various faults are claimed to have been committed in this case. It is claimed, in the first place, that the steamer should not have been moved at all until slack water, but there is no proof that vessels of that size cannot be moved safely, and are not habitually moved safely, in the East river, without waiting for slack water. It is asserted that it was a fault not to take the Jumna out stern first, and then, after she was clear of the pier, to take her straight down the river, without turning her bow around. But there is no evidence that the manner in which she was taken out was unusual, and there is evidence that there was a projecting pier and a steamer lying back of her stern, which might have interfered with her being safely taken out stern first. In other words, the question of the method of taking her out was one of judgment on the part of Capt. Howe, who was supervising the operation. It is claimed that the vessel should not have been taken out so far into the river before her head was turned down toward the Brooklyn shore. But while, in view of the strength of the tide in the middle of the river, it perhaps might have been somewhat wiser to have turned the Jumna down the river sooner, I cannot think that the neglect to do so amounted to such a substantial fault of navigation as to impose liability for this accident. The statute requires vessels navigating the East river to do so near the middle of the river. The river at that point is only about 1,500 feet wide, and I think that the evidence shows that the Dalzell worked over toward the Brooklyn shore and began the attempt to haul the bow of the Jumna around at about the proper time to do so. It is claimed that the Dalzell was in fault for giving a signal of two whistles to pass starboard to starboard, and that the Gypsum King was in fault in acquiescing and giving two whistles in reply. I think, on the evidence, that at the time these whistles were sounded the Gyp-

sum King had the Dalzell and the Jumna a little on her starboard hand, but I do not think that the starboard hand rule applies with full force to this case. The Jumna was being taken out from her dock, and had not yet entered upon her intended course. It must have been apparent to the Gypsum King that the Dalzell was in the act of hauling the bow of the Jumna around, and that her course was intended to be down the river. There were several vessels between the Gypsum King and the New York shore, and, in the position in which the two flotillas were, I think it would have been impracticable and dangerous for them to attempt to pass port to port. Almost all the witnesses experienced in navigation admitted that two-whistle signal was correct, that the proper maneuver under the circumstances was for the vessels to attempt to pass starboard to starboard, and that they would have so passed in safety if the hawser had not broken. It is alleged that the Jumna was at fault for furnishing a poor hawser. The evidence of the experts on ropes, as to the quality of the hawser that broke, is quite conflicting. I think, however, that the evidence preponderates that this was a good hawser. At all events, there is no evidence, in my opinion, that the officers of the Jumna or the pilot of the Dalzell had any reason to believe or suspect that it was not a good hawser. It was only six months old; it was made of good material; it was, if anything, a little larger than the usual size of hawsers used for such a purpose. Some of the witnesses for the Jumna assert that the Dalzell improperly subjected the hawser to a sudden jerk or jump, and that that was the cause of its breaking. I think that the evidence preponderates that the strain on the hawser was steady and continuous for some time before it broke, and that there was no fault in the management of the Dalzell which caused the rope to break. It is claimed that the Dalzell had hauled over into a position too far back of the bow of the Jumna, so as to produce an undue strain on the hawser, but I do not think that the evidence establishes that the Dalzell in that respect adopted any unusual or improper position or course of procedure.

There are two alleged faults in respect to which I have felt considerable hesitation. One is the neglect of the tug McCaldin Brothers to make fast on the port quarter of the Jumna before the hawser broke. The Jumna had employed three tugs to move her. She was not to be under her own steam, and was to depend entirely upon the auxiliary power of the tugs. She was entitled, therefore, to the service of three tugs, and she was entitled to have them render that service in the most effective manner. The evidence is clear that, after the steamer got out clear of the pier, the two tugs, the Stranahan and the McCaldin Brothers, could act more efficiently by having one made fast on each quarter, instead of both being made fast on one quarter side by side. In the former situation, if one tug worked its propeller forward and the other backward, they could assist materially in turning the steamer, and, in that situation, they could, in all respects, exercise a more efficient control over the steamer. I think that if the McCaldin Brothers had been made fast to the port quarter of the Jumna, while the Stranahan was made fast to the starboard quarter, there is some likelihood that they might have afforded such assistance to the Dalzell

in getting the steamer's bow around, that the hawser might not have broken, and also that, after the hawser did break, they might have succeeded in backing the Jumna, or holding her from being swept over towards the New York shore by the tide, so as to have avoided the collision. But the McCaldin Brothers could not go on the port quarter until the steamer was safely clear of the pier and there was adequate room to go around her stern. It would not take long for the Jumna, after she left the pier and got under headway, to reach the middle of the river. The proof is that Capt. Howe, after the steamer got clear of the pier, ordered the McCaldin Brothers to change her position and make fast on the port quarter, and that the tug endeavored to do so, and had got around on the port quarter, but before she could make fast the hawser broke. Some claim is made that the McCaldin Brothers left the Jumna and went off on other business for a while, but I think the evidence is clearly to the contrary. Upon the whole, I do not think that the evidence establishes that there was any such delay in her casting off from the Stranahan and getting into proper position and making fast on the port quarter of the Jumna as would justify a finding that she was guilty of negligence in that respect, making her liable for the collision. The other alleged fault, in respect to which I have also felt considerable hesitation, relates to the makeup of the tow of the Gypsum King. It is claimed that the Gypsum King was coming up the river at too great a speed, but I do not think that the evidence establishes that charge. I have felt, however, considerable doubt whether the Gypsum King ought not to be held responsible for the length of her tow, and the way in which it was arranged. The entire flotilla must have been about 800 or 900 feet in length, more than half the width of the river at that point. I think it would have been safer if the towing hawsers had been shorter, and probably the fact that the Calabria was trailing after the barge No. 19 and the Gypsum Emperor made them somewhat less responsive to the starboard helm than they would have been if the three boats in tow had been side by side. I doubt, however, whether it would have made very much difference, and, if the three boats had been side by side, it seems probable that at least two boats might have been injured in the collision with the Jumna, instead of one. The practice of towing on such long hawsers, in such a narrow and crowded part of the river, has often been criticised by the courts, but Congress has never prohibited the practice, and such a method of towing is usual in this harbor. A tug which makes up its tow in such a manner undoubtedly is bound to a high degree of care; but, such a method of making up a tow being usual and not being illegal, I am not able to see that the tug should be held liable for the collision simply because such a long tow is inherently more unmanageable than a shorter one. The tug was bound, in its navigation, to use extreme care; but, as I fail to see in this case that a proper degree of care was not used, I can see no justice in holding this tow liable in this case simply because of the accident. If it was not a legal fault to make up the tow in such a manner originally, it did not become a legal fault because a collision occurred.

Upon the whole, under all the circumstances of the case, I am not able to see that there was any actual fault in the navigation of these

vessels down to the time that the hawser broke. Almost all the wit-- nesses, experienced in navigation, assert that the sole cause of the collision was the breaking of the hawser. After the hawser broke it seems to me that all that occurred was in a legal sense inevitable. It is asserted that the Gypsum King should have cast off her line, and that the vessels in tow should have dropped their anchors. That possibly might have produced a better result, and might not. It was a question of judgment. The collision was imminent; all the parties were acting in extremis; whether the tug should cast off her line and leave the ves- sels in the tow to shift for themselves, or should go ahead at full speed and try to haul them clear of the New York piers, was a question of judgment; and an error of judgment, if one was committed, which I doubt, ought not to be considered, under such circumstances, a fault.

Upon the whole, in my opinion, there was no legal fault in the navi- gation of any of the vessels, but the collision was the result of an inevitable accident, in the sense of the admiralty law. My conclusion is that all the libels should be dismissed, with costs to the McCaldin Brothers and the Stranahan, and to the Dalzell, against the parties who have made claims against them, respectively.